IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-90-066-CR





SHAWN BASCOM,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT



NO. 100,569, HONORABLE JON N. WISSER, JUDGE 



 





 The jury found Shawn Bascom guilty of voluntary
manslaughter in the death of Christobal Hernandez, and assessed
punishment at 20 years' imprisonment. The trial court adjudged
Bascom guilty and sentenced him accordingly. We will affirm the
conviction.



THE CONTROVERSY


 Bascom testified at trial, after the State rested,
relating in detail the events surrounding his killing of Hernandez
and contending that he did not intend the homicide. Bascom
testified as follows:

 Bascom met Hernandez about seven o'clock in the evening
when Bascom was walking on a sidewalk adjoining the frontage road
of Interstate Highway 35, near the Town Lake bridge in Austin. 
Hernandez stopped his automobile, a gold BMW, and asked Bascom where Riverside Drive was located. Bascom got in Hernandez's car
to direct him to the street. Hernandez drove past the Riverside
Drive intersection (apparently with Bascom's consent), and the two
drove to a store where they bought beer, and then picked up
Hernandez's friend, Joey Williamson, at his residence nearby. The
three drove to a park. There they smoked marijuana and drank
several beers before going to a bar named The Back Room, where
Bascom was denied admission because of his minority. At Bascom's
suggestion, they drove then to Speed's Pool Hall on Riverside
Drive. There they stayed for several hours, drinking five or six
pitchers of beer for which Hernandez paid. By this time, Bascom
had deduced that Hernandez knew his way around Austin and had not
really required directions to Riverside Drive.

 After Williamson left, Hernandez and Bascom drove to
Hernandez's apartment to listen to music. There, they drank more
beer and smoked more marijuana. While the two were seated on a
sofa, Hernandez made a sexual advance toward Bascom by putting a
hand on Bascom's leg. Bascom resisted the gesture, but Hernandez
again put his hand on Bascom's leg and squeezed. Bascom stood and
jumped over a coffee table in front of the sofa. Hernandez came
toward Bascom, reassuring him that he "wasn't going to do nothing 
to [Bascom]." But when Hernandez continued to approach him, Bascom
took a knife from a nearby chair, pointed the knife at Hernandez,
and told him to "stay away." Hernandez "grabbed" Bascom around the
neck and tried to pull Bascom to the ground. Bascom managed to 
trip Hernandez, causing him to fall to the floor "pretty hard." 
Bascom fell on top of Hernandez. 

 While the two struggled, Bascom dropped the knife. 
Keeping Hernandez on the floor, Bascom tied Hernandez's hands
behind his back and his feet together, and gagged him (Bascom
testified that he bound and gagged Hernandez with pillow cases that
Bascom had removed from pillows in a linen closet while the two men
were struggling). Bascom then brought Hernandez a paper towel for
his finger which he had cut during the struggle. Throughout the
struggle, Bascom repeatedly told Hernandez to leave him alone, and
that he wanted to leave. 

 After wiping the beer bottles to remove any fingerprints,
Bascom started toward the door, but Hernandez had untied the
bindings on his feet and was trying to get up, so Bascom "grabbed
him from the back of the neck up around by his hair on the back of
his shirt and bent him." Bascom then hit Hernandez in the stomach,
seizing him at the same time, then "leaned him toward the chair
. . . turned him around and threw him onto the couch, ran him into
it." After the two wrestled, Bascom then put a neck tie around
Hernandez's neck, and "grabbed [the tie] with [his] right-hand as
tight as [he] could," holding the ligature for about twenty
seconds, Hernandez struggling all the while. 

 After determining that Hernandez's pulse had stopped,
Bascom waited in the apartment for 45 minutes. Then he "wiped the
place down," took the money from Hernandez's wallet, took
Hernandez's car, and drove down Interstate Highway 35 to a roadside
park in New Braunfels where he spent the night. Bascom spent the
next two days driving around and visiting people. 

 A couple of days after Hernandez's death, peace officers
arrested Bascom in Kyle after he had cashed one of Hernandez's
checks at a store in Creedmoor.

 Bascom also testified that he had not meant to kill or
even hurt Hernandez, that Hernandez had not told Bascom that he was
gay, and that Hernandez had not made any sexual advances toward him
before the two left Speed's pool hall together.



THE CONFESSION


 While in police custody, Bascom confessed to killing
Hernandez and gave an account of what had happened the night of the
killing and during the two days between Hernandez's death and 
Bascom's arrest. 

 On appeal, Bascom complains, in his fifth point of error,
that "the trial court erred in admitting into evidence . . . [the
confession] when the involuntary character of the statement was
established and when appellant invoked his right to counsel." 
Because Bascom waived any error resulting from the admission of the
confession, we need not consider whether the trial court erred in
admitting the confession.

 Under the doctrine of "curative admissibility," the
admission of improper evidence cannot be grounds for reversal if
the defendant gives testimony on direct examination that
establishes the same facts as those established by the evidence of
which he complains. Sherlock v. State, 632 S.W.2d 604, 606 (Tex.
Cr. App. 1982); Thomas v. State, 572 S.W.2d 507, 512 (Tex. Cr. App.
1976). The doctrine of curative admissibility does not apply,
however, if the defendant testified in order to overcome the impact
of the improperly admitted evidence. See Sherlock, 632 S.W.2d at
606; Thomas, 572 S.W.2d at 512-13. Thus, if the defendant took the
stand in order to refute, deny, contradict, or impeach the
improperly admitted evidence, error is not waived. Id. 

 In the present case, Bascom's confession is no more
incriminating than his trial testimony: in both, Bascom related 
substantially the same story about the events surrounding
Hernandez's death. The only material inconsistency between
Bascom's trial testimony and his confession related to when he
realized that Hernandez may have known his way around Austin and
did not really need directions to Riverside Drive: in his
statement, Bascom said he did not begin to realize that Hernandez
may have known his way around Austin until the three men were at
Speed's; in his direct testimony, on the other hand, Hernandez
stated that he had "figured it out" by the time the two men arrived
at Williamson's residence. 

 In determining whether the State met its burden of
proving that the defendant did not testify in order to overcome the
impact of an improperly admitted confession, we are instructed to
consider the following factors: (1) evidence that defendant would
not have testified but for the admission of the confession;
(2) evidence that, even if the defendant would have testified
regardless of whether the confession had come into evidence, he
would have testified in the same manner had the confession not been
admitted; (3) whether the State introduced other evidence of guilt
and the strength of that other evidence; and (4) whether there is
other evidence, aside from the evidence objected to, that would
have induced the defendant to testify in the same manner. See
Sherlock, 632 S.W.2d at 607.

 In the present case, there is nothing in the record
indicating that Bascom would not have testified had the confession
been excluded. Secondly, there is no indication that Bascom's
testimony on direct examination would have been any different from
that which he in fact gave had the confession not been admitted. (1)

 Concerning the third factor from Sherlock, we conclude
that the other evidence of guilt tended strongly to corroborate the
State's case. 

 Joey Williamson, Hernandez's friend who had accompanied
Bascom and Hernandez to the park and Speed's Pool Hall on the night
of Hernandez's death, told substantially the same story as did
Bascom regarding the events of the evening up until the time
Williamson left Speed's Pool Hall at around 12:30.

 Williamson testified, in addition, that while the three
were in the car at a park, Bascom had pulled a firearm out of his
boot, put it on his waistband, and was "kind of bragging about it
a little bit." Williamson also testified that, while the three
were at Speed's, Bascom told him that Hernandez "was gay and if he
comes on to him he'll do something real bad to him." Williamson
responded by saying, "[h]e's cool. He won't come on to you. Just
tell him no." Williamson left Speed's about 12:30 or 12:45 that
night. He called Hernandez twice during the next two days, but was
answered by a recording each time. When he called a third time, a
homicide detective answered the telephone and informed Williamson
that Hernandez was dead.

 Williamson's account of the evening differed from
Bascom's in only two material respects: firstly, Williamson
recounted his conversation with Bascom in Speed's regarding
Hernandez's homosexuality, whereas Bascom testified that, when they
left Speed's, he did not suspect Hernandez was homosexual;
secondly, contrary to Williamson's testimony, Bascom testified on
cross-examination that he did not have a firearm the night he
accompanied Hernandez and Williamson.

 Police officers, EMS employees, and other witnesses
testified that, on the morning of May 17, 1989, they found
Hernandez face-down on his couch, gagged, hands and feet bound,
with a tie around his neck. One of the officers and a medical
examiner testified that the pillowcases binding Hernandez's hands,
feet, and mouth were folded "lengthwise" and loosely tied. 
(Apparently, a friend of Hernandez who discovered the body that
morning and called the police had attempted to untie the binding on
the wrists, loosening it. There was no evidence that any of the
other pillowcases had been disturbed.) 

 Sergeant Cearley, a homicide detective, observed that
there was no sign of struggle: the apartment was very clean and
there was no blood anywhere except on the couch under Hernandez's
head and on Hernandez's finger where Sergeant Cearley saw a small
cut. Hernandez held a paper towel in his cut hand. Sergeant
Cearley also observed that there was a pillow with no case on it in
the back bedroom of the apartment.

 Irma Rios, a DPS chemist, testified she did not find any
blood stains or other significant evidence on Bascom's clothing and
that she did not find any of Bascom's hair or any blood of Bascom's
type on the pillowcases used to bind Hernandez, on the paper towel
in Hernandez's hand, or on Hernandez's clothing.

 Suzanna Dana, a medical examiner who performed an autopsy
on Hernandez's body, testified that Hernandez had died of
strangulation with a ligature. She also testified that it did not
appear that Hernandez had struggled during the strangulation
because the bindings around his wrists and ankles were neatly
rolled and there were no abrasions on his wrists or ankles where
the pillowcases were tied. She testified that the small cut on
Hernandez's forefinger did not appear to be a "defensive wound." 

 Other evidence showed that Bascom was driving Hernandez's
car when police arrested him two days after Hernandez's death and
that he had cashed two checks on Hernandez's account after
Hernandez's death and before he was arrested.

 Rita Shields, the mother of a friend of Bascom, testified
that Bascom had come to her house on May 17. He was driving a Gold
BMW which he told her was a company car owned by IBM, where he
worked as a courier. Not believing the story, Shields called her
brother, an officer with the Austin Police Department, gave the
vehicle identification number on the car, and learned that the car
had been reported stolen. Shields testified that Bascom's mood had
been the same as ever -- that he was "laughing and talking and
cutting up." 

 David Stocker, an "I.D. technician," found fingerprints
on a paper on Hernandez's coffee table. He concluded the prints
were "conclusive as to the identity" of Bascom. He also testified
that the coffee table and beer bottles in Hernandez's apartment
appeared to have been "wiped clean."

 The evidence presented by the state, not considering the
confession or Bascom's own testimony, strongly supported the
State's theory that Bascom went to Hernandez's home intending to
rob him: Williamson's testimony linked Bascom to Hernandez around
the estimated time of Hernandez's death; Williamson testified that
he had talked with Bascom about Hernandez's homosexuality and that
Bascom had warned that, if Hernandez "comes onto him he'll do
something real bad to him"; the "I.D. technician" found Bascom's
fingerprint on a piece of paper in Hernandez's apartment and stated
that the coffee table and beer bottles had in his opinion been
"wiped clean"; several witnesses testified that Hernandez's body
was found face down on his couch, his wrists and ankles bound and
his mouth gagged with pillowcases, and a tie around his neck; the
medical examiner testified that Hernandez had died of strangulation
with a ligature and that there appeared to have been no struggle;
Sergeant Cearley testified that the condition of the apartment did
not indicate that any struggle had occurred there; evidence showed
there was no cash in Hernandez's wallet, which was lying on the
coffee table; Bascom was arrested driving Hernandez's gold BMW the
day after Hernandez's body was found; Rita Shields testified that
Bascom lied about where he had got the gold BMW; and evidence
showed that Bascom cashed two checks on Hernandez's bank account
that were dated after the estimated time of Hernandez's death.

 We consider now the fourth Sherlock factor -- whether
there was any evidence, exclusive of the confession itself, which
would have induced Bascom to testify in the case. We believe there
was. The cause of Hernandez's death (strangulation with a neck
tie) implied an intentional homicide, and no evidence suggested
self-defense, an accident, or other exculpatory circumstances. The
testimony of witnesses placed Bascom with Hernandez at the time of
death, and the fingerprint evidence placed Bascom at the scene of
death. Immediately after Hernandez's death, Bascom was in
possession of Hernandez's automobile; he explained his possession
by a falsehood; and he withdrew sums from Hernandez's bank account
through the use of Hernandez's blank bank checks. The strength of
this evidence explains the position taken by Bascom's lawyer in
closing argument to the jury: "I knew in the very beginning,
although I had to hold it back as a hold [sic] card, I knew my
client would take the stand." We hold that the evidence, apart
from the confession, would have induced Bascom to testify.

 Based on our consideration of the four factors enumerated
in Sherlock and because any inculpating inferences from the
confession were also presented to the jury by Bascom himself in his
trial testimony, we hold the doctrine of curative admissibility
precludes reversal based on erroneous admission of the confession. 
We therefore overrule Bascom's fifth point of error.



EVIDENCE OF AIDS


 At trial, Bascom proffered, through a bill of exceptions,
testimony by Hernandez's treating physician that Hernandez suffered
from the AIDS (acquired immune deficiency syndrome) virus and
malignant lymphoma (a cancer of the lymphoid system), was under
chemotherapy for his cancer, and was taking several other
medications for AIDS-related illnesses at the time of his death. 
The physician also testified that Hernandez's illnesses and
chemotherapy had caused him to feel weak and that the AIDS virus is
transmitted through sexual contact. The trial court excluded the
testimony on the grounds that such evidence was not "relevant [or]
material" (2) and that the prejudicial effect would outweigh any
probative value. 

 In his first point of error, Bascom contends the trial
court committed reversible error by refusing to allow into evidence
the physician's testimony that Hernandez suffered from AIDS. 

 In reviewing the trial court's decision whether to admit
evidence, we cannot disturb the trial court's ruling except for
abuse of discretion. See Johnson v. State, 698 S.W.2d 154, 160
(Tex. Cr. App. 1985), cert. denied, 479 U.S. 871 (1986); Torres v.
State, 794 S.W.2d 596, 600 (Tex. App. 1990, no pet.).

 We agree with the trial court that the evidence showing
that Hernandez suffered from AIDS was not relevant to any material
issue in the case. The fact that the victim had AIDS would be
relevant only if Bascom attempted to prove that he killed Hernandez
in self-defense. Under a theory of self-defense, Bascom would have
had to prove that he had a reasonable belief Hernandez had AIDS,
and therefore had a reasonable belief that deadly force was
necessary to repel Hernandez's use of deadly force. See Tex. Pen.
Code Ann. § 9.32(3)(A) (Supp. 1991). There was no evidence at
trial suggesting any of these factors.

 Holding the trial court did not abuse its discretion in
excluding evidence that Hernandez had AIDS, (3) we overrule Bascom's
first point of error.



 EVIDENCE OF HERNANDEZ'S WEAKENED PHYSICAL CONDITION


 In his second and third points of error, Bascom complains
the trial court erred by not permitting the physician's testimony
about the effect of cancer, chemotherapy, and other diseases on
Hernandez's physical condition. Bascom asserts that, even if the
trial court believed the evidence of AIDS too prejudicial, it
should have permitted the physician to testify about Hernandez's
other physical ailments. Bascom avers the testimony is relevant to
rebut the State's theory that Bascom was the first aggressor or,
alternatively, that Hernandez either allowed Bascom to tie him up
or that Bascom tied him up after he died. The evidence of
Hernandez's weakened physical condition, Bascom contends, would
rebut the State's theory and corroborate Bascom's account of what
happened in Hernandez's apartment.

 While evidence of a victim's physical condition is
admissible if relevant, Lopez v. State, 535 S.W.2d 643, 650 (Tex.
Cr. App. 1976), we cannot say in the present case that the trial
court abused its discretion in deciding that the physician's
testimony was not relevant or that its prejudicial effect
substantially outweighed any probative value. See Johnson, 698
S.W.2d at 160; Torres, 794 S.W.2d at 600. After sustaining the
State's objection to the physician's testimony, the court stated: 
"After all the evidence is in, perhaps the Defense may reargue the
admissibility of some of this. To say that the victim had a slight
weakness still makes him stronger than 50 percent of the people. 
It is all such a relative thing. I don't know that it's very
meaningful." Indeed, the physician testified that Hernandez's
"general condition was a little weaker" and that "he might be a
little bit more susceptible to the effects from a general weakened
condition." (Emphasis added.)

 Furthermore, Bascom had already presented evidence that
Hernandez suffered from cancer at the time of his death, and that
his physical condition was weak as a result: on cross-examination 
of Hernandez's friend Sherry Warren, Bascom's counsel asked whether
Hernandez had told her "of a physical condition that he had that
left him in a weakened position, weakened physically." She
responded that he had, that "[h]e had cancer. That's [why] he was
going for the doctor's." 

 The trial court may have concluded that the probative
value of the testimony was not great because even though Hernandez
may have suffered from a "slight weakness," he was still "stronger
than fifty percent of the people." Moreover, the trial court could
reasonably have concluded that the prejudicial effect outweighed
any slight relevance the evidence may have had. We therefore hold
that the trial court did not abuse its discretion, overruling
Bascom's second and third points of error.

 Bascom further asserts, in his fourth point of error,
that "the trial court erred in preventing [Bascom] from responding
to invited argument regarding the physical condition of [Bascom] in
comparison to the physical condition of [Hernandez]." In support
of his point of error, Bascom seems to contend that the trial court
should have allowed Bascom's counsel to argue, during final
argument, that Hernandez had AIDS at the time of his death or that
he was physically weak for reasons stated in the physician's
testimony because the State invited argument on Hernandez's
weakened physical condition by the following remarks:



And when you ask yourself whether the defendant's
testimony about how this happened is reasonable, think
about it and ask yourself: Could you tie someone up, a
grown man struggling, with pillow cases binding his hands
and his feet? Maybe somebody could do that. Maybe
Arnold Schwarzenegger could do it, but that's not who
[Bascom] is. 



 In light of our holding that the trial court did not
abuse its discretion in excluding the physician's testimony, we
hold that the trial court did not err in not allowing Bascom to
state the contents of such testimony in final argument. Jury
argument based upon matters not in evidence or not reasonably
inferable from the evidence is improper. Allridge v. State, 762
S.W.2d 146, 155 (Tex. Cr. App. 1988), cert. denied, 489 U.S. 1040
(l989). We overrule Bascom's fourth point of error.



WARRANTLESS ARREST


 In his sixth point of error, Bascom complains "the trial
court erred in failing to sustain appellant's timely motion to
suppress evidence obtained after unlawful arrest without warrant." 
In his argument of the point, Bascom does not, however, specify
which items of evidence were obtained as a result of the arrest,
but simply argues, in some detail, why the arrest was illegal.

 We need not reach the merits of the point because Bascom
has not properly preserved any error in this respect. Firstly,
Bascom failed to obtain a ruling on the motion to suppress, and
therefore failed to preserve for appeal any complaint regarding the
motion. (4) See Tex. R. App. P. Ann. 52(a) (Pamph. 1991). Secondly,
Bascom does not, in his brief, connect the allegedly illegal arrest
with any specific item of evidence. Moreover, the motion to
suppress states, generally, that the following evidence should be
suppressed: 



All tangible evidence seized by law enforcement officers
or others in connection with the detention and arrest of
Defendant in this cause or in connection with the
investigation of this cause[;] [a]ll written and oral
statements made by Defendant to any law enforcement
officers or others in connection with this cause[;]
[t]estimony of law enforcement officers of [sic] others
concerning any actions or [sic] Defendant while under
detention or arrest in connection with this cause[;]
[t]estimony of law enforcement officers or others
concerning the tangible evidence or statements to which
reference was made above.



Because Bascom failed to state in his brief which items of evidence
were erroneously obtained as a result of the arrest and in light of
the non-specific nature of the motion to suppress, we hold that
Bascom has failed to direct our attention "to the error about which
complaint is made," thereby waiving any error. Tex. R. App. P.
Ann. 74(d) (Pamph. 1991). We overrule Bascom's sixth point of
error.



INSTRUCTION REGARDING LACK OF IMPULSE CONTROL


 In his seventh point of error, Bascom contends the trial
court erred in failing to instruct the jury "to disregard
statements of the prosecutor that Bascom suffered from a mental
illness that prevented him from controlling his behavior." Bascom
directs his complaint at the following comment by the prosecutor in
her opening statement: "You are going to find out that this
defendant cannot read or write because he has a learning disability
because of an emotional disturbance, that he cannot control his
impulses." Bascom objected to the statement, then requested a
mistrial (which request the trial court denied), but failed to
obtain a ruling on his objection or object to the trial court's
failure to rule on the objection. See Tex. R. App. P. Ann. 52(a). 
He therefore waived any complaint on appeal. We overrule Bascom's
seventh point of error.



EVIDENCE OF HERNANDEZ'S SEXUAL HISTORY


 At trial, Bascom attempted to introduce testimony of
Hernandez's friends, Gary McNeese and Sharla Bolerjak, regarding
Hernandez's homosexual promiscuity. In his eighth point of error,
Bascom contends the trial court erred in excluding testimony
respecting Hernandez's sexual tendencies. 

 The State objected to the testimony on the ground that it
was inadmissible character evidence and the trial court sustained
the objections as to both witnesses. On appeal, Bascom urges that
the evidence was relevant because it tended to support the
following theories: (1) Hernandez "sought out" Bascom;
(2) Hernandez made sexual advances toward Bascom; and (3) Hernandez
"had a plan and . . . his actions were not accidental or
arbitrary." 

 Relevant evidence is "evidence having any tendency to
make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it
would be without the evidence." Tex. R. Cr. Evid. Ann. 401.
Evidence of Hernandez's sexual history is not relevant to any
material issue in Bascom's case. It does not refute any element of
the offense or support any element of any exculpatory theory. We
therefore hold the trial court did not abuse its discretion in
excluding the evidence of Hernandez's sexual history. Johnson, 698
S.W.2d at 160. Because we hold the evidence is not relevant, we
need not address Bascom's argument that it constituted admissible
character or habit evidence. We overrule Bascom's eighth point of
error.



"BLOOD-SPLATTER" REPORT


 In his ninth point of error, Bascom asserts that the
trial court, in a pre-trial order, "granted [Bascom] the right to
discover any scientific reports produced by witnesses for the
State"; and "[t]he trial court erred in failing to grant a mistrial
due to the State's failure to provide [a] blood splatter report as
required by the discovery order." We find in our transcript what
purports to be a proposed pre-trial discovery order. It is not
signed and bears no indication that the trial court actually
rendered the order that forms the basis of Bascom's complaint. We
therefore overrule the point. 

 In his tenth point of error, Bascom contends the trial
court erroneously denied his motion for a continuance when he
learned of the existence of the blood-splatter report which the
State had received and did not turn over to him. In light of the
fact that there is in the record no discovery order signed by the
trial judge, and no showing that the State was ordered to turn over
the blood-splatter report, we hold the trial court did not err in
denying Bascom's motion for continuance. We therefore overrule
Bascom's tenth point of error. 



CHAIN OF CUSTODY


 In his eleventh and twelfth points of error, Bascom
contends the trial court erred by admitting into evidence several
items of Bascom's clothing; some boots that Sergeant Cearley of the
Austin Police Department testified he found in Bascom's bedroom;
and the pillow cases, neck tie, and paper towel, which were found
on Hernandez's body. Sergeant Cearley identified the pillow cases,
neck tie, and paper towel as those which the medical examiner
removed from Hernandez's body and handed to Cearley before
performing the autopsy. He also identified the clothing and boots
as items which he had found in Bascom's bedroom. 

 Bascom does not indicate in his brief where he believes
there was a break in the chain of custody. However, we need not
address the question because we believe, beyond a reasonable doubt,
that any error in the admission of the complained-of evidence could
not have contributed to the conviction. See Tex. R. App. P. Ann.
81(b)(2) (Pamph. 1991); see generally Harris v. State, 790 S.W.2d
568, 586-88 (Tex. Cr. App. 1989) (Duncan, J.). 

 Presumably, the purpose of introducing the pillowcases,
neck tie, and Bascom's clothing was to corroborate the already-
ample evidence that Bascom was in Hernandez's apartment the night
of Hernandez's death, and that he strangled Hernandez with a
ligature. Bascom admitted, in his testimony and written
confession, that he strangled Hernandez in his apartment. Because
we believe any error was harmless, we overrule Bascom's eleventh
and twelfth points of error.



JURY VOIR DIRE


 In his thirteenth point of error, Bascom avers the trial
court erred by allowing the State to ask the venire whether they
were aware of an incident in Dallas in which a trial judge imposed
a light sentence on a defendant whose victims were homosexual and
whether they thought the sexual orientation of the victim should
bear any relevance to the length of a defendant's sentence. 

 In reviewing the point of error, we note that the scope
of voir-dire examination by counsel is within the discretion of the
trial court. Dowden v. State, 758 S.W.2d 264, 274 (Tex. Cr. App.
1988); Clark v. State, 608 S.W.2d 667, 669 (Tex. Cr. App. 1980);
Preston v. State, 242 S.W.2d 436, 439 (Tex. Cr. App. 1951), cert.
denied, 343 U.S. 917 (1952). The permissible areas of questioning
the panel in order to exercise peremptory challenges are broad and
cannot be unnecessarily limited. Mathis v. State, 576 S.W.2d 835,
836 (Tex. Cr. App. 1979). 

 We cannot say the trial judge abused his discretion. The
question concerned a punishment consideration that was legally
irrelevant but which might influence a juror given the facts of the
case. Accordingly, we overrule Bascom's thirteenth point of error. 
 In light of our disposition of Bascom's thirteenth point
of error, we also overrule his fourteenth point of error in which
he complains of prosecutorial misconduct in the State's questioning
the venire about the controversial sentencing by a Dallas judge.



WITNESS LIST


 In his fifteenth and final point of error, Bascom
contends the trial court erred by allowing Guadalupe Hernandez, the
victim's brother, to testify at trial when his name was not on the
State's witness list. 

 If the trial court permits a witness not on a witness
list to testify, we may reverse the trial court's decision only if
the trial court abused its discretion. Hightower v. State, 629
S.W.2d 920, 925 (Tex. Cr. App. 1981). In determining whether the
trial court abused its discretion, we consider whether the
defendant could reasonably have anticipated that the witness would
testify and whether there was a claim of bad faith on the part of
the prosecutor. Bridge v. State, 726 S.W.2d 558, 566-67 (Tex. Cr.
App. 1986); Hightower, 629 S.W.2d at 925. 

 In the present case, the State argued to the trial court
that, before trial, it had furnished Bascom with a witness list
naming "Hernandez family member," but that, at the time, the State
did not know whether it would call Hernandez's mother, brother, or
sister. The State further contended that it had advised Bascom's
counsel of the uncertainty as to which family member it would call
and that Bascom had not complained. Bascom did not contest the
State's statements to the trial court or suggest any bad faith on
the part of the State. Furthermore, we do not believe Bascom could
have been harmed by the contents of the brother's testimony -- the
witness merely identified the victim's photograph, established the
correct name of the victim in the indictment, and stated the names,
ages, and locations of other family members of the victim. 

 In light of the lack of any indication of bad faith by
the prosecution and the limited nature of the brother's testimony,
we hold the trial court did not abuse its discretion in permitting
the victim's brother to testify, but that any error was harmless in
all events. We therefore overrule Bascom's fifteenth point of
error.

 We affirm the judgment of the district court.



 

 John Powers, Justice

[Before Justices Powers, Aboussie and Kidd]

Affirmed

Filed: August 28, 1991

[Do Not Publish]
1. During direct examination, neither Bascom nor his counsel
referred to the statement; Bascom simply related a version of the
facts surrounding Hernandez's death that was almost identical to
that which he had recounted in his confession. It was not until
his cross-examination that the prosecution referred repeatedly to
the confession in order to impeach Bascom with inconsistencies
between his direct examination and the statement. With the
exception of the discrepancy between his confession and direct
testimony regarding when he realized that Hernandez did not need
directions to Riverside Drive, the inconsistencies with which the
State tried to impeach Bascom were minor and did not relate to
any material facts surrounding the offense. 


On re-direct examination, Bascom explained that he had not
intentionally misled the officer taking his statement with
respect to the "little details," but that at trial he recalled
some details that he had not remembered when he gave his
statement. 
2. Evidence is relevant if it tends "to make the existence
of any fact that is of consequence to the determination of the
action more probable or less probable than it would be without
the evidence." Tex. R. Cr. Evid. Ann. 401 (Pamph. 1991).
3. Bascom also argues that evidence of the character of the
victim is relevant, even if the defendant is not aware of the
character trait, if such character evidence is being offered to
prove that the victim was the first aggressor. See Beecham v.
State, 580 S.W.2d 588, 590 (Tex. Cr. App. 1979). Evidence that
Hernandez had AIDS is not character evidence; it is evidence of a
bodily disease. Thus, Beecham does not apply in the present
case.


Bascom argues next that the evidence showing that Hernandez had
AIDS is relevant because it shows the physical condition of the
victim, which is relevant in homicide prosecutions. See Lopez v.
State, 535 S.W.2d 643, 650 (Tex. Cr. App. 1976). Even if such
evidence is relevant, we see no basis for holding that the trial
court abused its discretion in determining that the prejudicial
effect of such evidence would outweigh any probative value it may
have.


Finally, Bascom argues that the AIDS evidence was relevant
because Hernandez's bodily fluids, with which he could spread the
AIDS virus, constituted a secret weapon, evidence of which was
relevant. See Meyer v. State, 276 S.W.2d 286, 290 (Tex. Cr. App.
1954). We disagree. In Meyer, the court of criminal appeals
stated that a pistol found in the defendant's car beside the one
which he had used to kill the victim would be admissible to show
the defendant's preparation. Meyer applies to a defendant's
weapon, not a weapon possessed by the victim, and is therefore
inapposite in the present case.
4.   The transcript contains a proposed order on Bascom's
Motion to Suppress Evidence. However, the proposed order is not
signed; nor does it bear any other indication that the trial
court ruled on it.